J-A27026-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MITCHELL NAZARIO | : | |
| | : | |
| Appellant | : | No. 665 MDA 2022 |

Appeal from the PCRA Order Entered March 31, 2022
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0001479-2017

BEFORE:   DUBOW, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:              **FILED: FEBRUARY 22, 2023**

Mitchell Nazario appeals from the order dismissing his Post Conviction Relief Act ("PCRA") petition. ***See*** 42 Pa.C.S.A. §§ 9541-9546. We affirm.

In January 2018, a jury convicted Nazario of first-degree murder. 18 Pa.C.S.A. § 2502(a). The trial court previously summarized the facts of the case as follows:

> On the night of February 1, 2016, Alexa Pritt heard people talking outside her home in the area of Kittatinny and South 14th Street in Harrisburg[, Pennsylvania]. She next heard two loud booms or cracks, then the sound of car tires screeching. Ms. Pritt looked out her window and saw a dark-colored car drive away toward a stop sign [and] then turn right. Ms. Pritt saw something in the middle of the street[,] which she thought might have been a tire. Frightened, Ms. Pritt looked out her front door and saw a truck drive by the object, flash its lights, [and] then continue on. Within approximately five minutes of hearing the loud noises,

---

[*] Retired Senior Judge assigned to the Superior Court.

police and ambulances arrived at the scene and attempted to revive a person lying in the street.

That night, Robert Mumma went with a friend to the area of [South] 14th and Kittatinny Streets to buy drugs. Shortly before the killing occurred, Mumma briefly saw the victim, Freddy J. Williams, known as Freddie J, in an alleyway near the house where Mumma intended to buy drugs. Mumma knew [Williams] from Dauphin County Prison and as a fellow drug user.[ ] After buying drugs, Mumma returned to the vehicle in which his friend waited. Mumma intended to use the heroin in the vehicle. As he sat in the parked vehicle, Mumma saw [Williams] pace back and forth from corner to corner. Mumma next observed a car pull up and stop. [Williams] approached the passenger side of the car and leaned on the car. Mumma did not see any attempt by [Williams] to enter the car. Mumma took note of the vehicle, worried that it might be police. Immediately after [Williams] approached the stopped car, Mumma heard shots. Mumma heard [Williams] yell something[,] which he could not discern, [and] then saw him fall down. Mumma observed the car speed off. The driver of the vehicle in which Mumma rode drove to the spot where [Williams] was lying in the street. It was apparent to Mumma that [Williams] was mortally wounded. Mumma and the driver left the scene. Mumma did not observe any weapons on [Williams] as he lay in the street.

Harrisburg City Police Officer Brian Carriere[ ] was working patrol in a marked police unit that night when, at 9:52 p.m., he received a dispatch of a victim down near the intersection of South 14th and Kittatinny Streets. When Officer Carriere arrived, he saw a man lying in the middle of the street. Officer Carriere observed a gunshot wound to the victim's right arm and a bullet in the chest or abdominal area.

Officer Donald Bender also responded to the scene. Officer Bender observed the victim to be in grave condition. Officer Bender observed an exit wound to Williams' back and an expanded projectile embedded in his clothing on the right side of his chest. Paramedics arrived and transported the victim to [the] hospital. Williams was pronounced dead shortly after arrival at the hospital.

Forensic pathologist Wayne Ross, M.D., testified regarding the autopsy performed upon Williams. The autopsy revealed gunshot wounds to the right side of the body, one to the right chest, one to the right forearm and a third impact wound to the chest. Dr. Ross categorized the injury to the victim's right forearm as a defensive [wound] sustained when the victim raised his right extremity in an attempt to ward off a gunshot. One gunshot passed entirely through the right lung, with a trajectory of front to back and downward. The gunshot to the lung caused Williams' death. Because no soot or gunshot powder residue existed at the wound sites or on the clothing, Dr. Ross opined that the shots were fired from a distance of three to four feet or greater. Dr. Ross opined that based upon Williams' height [of] five feet two inches, the lack of soot and gunpowder residue, and the trajectory of the bullets, Williams was outside the vehicle when shot.

Ten days later, on February 11, 2016, Harrisburg City Police Officer Daniel [Antoni] encountered [Nazario] in the area of Hall Manor near the scene of the homicide. Officer [Antoni] identified himself as a police officer and approached [Nazario]. [Nazario] appeared shocked, then took a step as if he intended to run. Officer [Antoni] drew his gun and commanded [Nazario] to get on the ground. Fellow officer Nate Owens arrived and placed [Nazario] in handcuffs. Officer Owens patted [Nazario] down and retrieved a .40 caliber semiautomatic handgun with an extended magazine. [Nazario] told police that he obtained the gun a few days earlier. [Nazario] was not charged with the murder at that time.

Harrisburg Police sent the gun to the Pennsylvania State Police for laboratory testing. The testing revealed that the cartridge case obtained from the homicide scene and the bullet jacket retrieved from Williams' body during the autopsy were discharged from the .40 caliber semiautomatic handgun removed from [Nazario's] person on February 11, 2016.

On February 1, 2017, one year after the killing occurred, Harrisburg City Police Detective Jason Brinker conducted a recorded interview of [Nazario]. Throughout the one hour and forty minute interview, [Nazario] denied involvement in the killing. Detective Brinker then consulted with the Office

- 3 -

of the District Attorney to obtain authorization to charge [Nazario]. Detective Brinker apprised [Nazario] that he would be charged with murder. The detective then initiated a second interview of [Nazario] in which he employed a different interview technique. In that interview, [Nazario] admitted that he shot [Williams.]

At trial, [Nazario] testified that on the night of the incident, as he slowed his car to [a] stop at a stop sign in the area of [South] 14th and Kittatinny Streets, he saw [Williams] running toward the car. When [Nazario] stopped his car, [Williams] banged on the window. [Nazario] testified that [Williams] then ran to the passenger side of the car. [Nazario] testified that he rolled down the window and asked [Williams] what he needed. [Nazario] testified that [Williams] appeared intoxicated and partially entered the passenger side window and appeared to reach for something. [Nazario] stated that he grabbed his gun from his lap and shot [Williams] twice. [Nazario] admitted that he did not see what [Williams] had in his hand and that [Williams] neither displayed a weapon nor made a threat upon [Nazario's] life.

Trial Court Opinion, Sept. 4, 2018, at 1-5 (citations to notes of testimony omitted).

At trial, Nazario raised a self-defense claim. His counsel also argued that the castle doctrine applied. The Commonwealth objected, and the trial court concluded the castle doctrine did not apply because Nazario illegally possessed a gun at the time of the shooting. The trial court provided the following self-defense instruction to the jury:

If the Commonwealth proves to you beyond a reasonable doubt that [Nazario] used deadly force then to prove that such force was not justifiable in this case it must prove one of the following elements beyond a reasonable doubt: A, that [Nazario] did not reasonably believe that he was in immediate danger of death or serious bodily injury at the time he used the force, and that, therefore, his belief that it

was necessary for him to use deadly force to protect himself was unreasonable.

Put another way, the Commonwealth must prove either that [Nazario] did not actually believe he was in danger of death or serious bodily injury such that he needed to use deadly force to defend himself at that point; or, that while [Nazario] actually believed he needed to use deadly force, his belief was unreasonable in light of all the circumstances known to him.

Keep this in mind: A person is justified in using deadly force against another not only when they are in actual danger of unlawful attack but also when they mistakenly but reasonably believe they are.

A person is entitled to estimate the necessity for the force he employs under the circumstances as he reasonably believes them to be at the time. In the heat of conflict, a person who has been attacked ordinarily has neither time nor composure to evaluate carefully the danger and make nice judgments about exactly how much force is needed to protect himself.

Consider the realities of the situation faced by [Nazario] here when you decide whether or not the Commonwealth has proven beyond a reasonable doubt either that, one, he did not believe he was actually in danger of death or serious bodily injury to the extent that he needed to use such force in self-defense; or, two, that while he did believe that, his belief was unreasonable.

That [Nazario] knew he could avoid the necessity of using force with complete safety by retreating, but he failed to do so, is the other area that you should consider when deciding whether or not the Commonwealth has proven the elements beyond a reasonable doubt.

Now, the final area I must discuss with you is voluntary manslaughter. And then I'm going to give you some final instructions, and you'll be prepared to deliberate.

As my earlier definition of malice indicates, there can be no malice when certain reducing circumstances are present. When these circumstances are present a killing may be voluntary manslaughter, but never murder. This is true

when a defendant kills under an unreasonable mistaken belief in justifying circumstances.

Accordingly, you can find malice and murder only if you are satisfied beyond a reasonable doubt that [Nazario] was not acting under an unreasonable belief that the circumstances were such that if they existed would have justified the killing.

The reducing circumstance of a defendant acting under an unreasonable belief that the circumstances of the killing were justified applies where [Nazario] actually believed that he was in immediate danger of death or serious bodily injury at the time he used deadly force but his belief was unreasonable in light of the facts as they appeared to him at the time; or [Nazario] did not violate his duty to retreat from the place as I explained those terms when I described to you the justification defense.

So let me read this again to you: The reducing circumstance of a defendant acting under an unreasonable belief that the circumstances of the killing were justified applies where, one, [Nazario] actually believed that he was in immediate danger of death or serious bodily injury at the time he used deadly force but his belief was unreasonable in light of the facts as they appeared to him at the time; or [Nazario] did not violate his duty to retreat from the place as I explained those terms when I described to you the justification defense.

N.T., Jan 16-18, 2018, at 401-404.

The jury found Nazario guilty of first-degree murder, and the court sentenced Nazario to life imprisonment. Nazario filed a post-sentence motion, which the trial court denied. Nazario filed a direct appeal *nunc pro tunc* arguing, among other issues, that the trial court erred in failing to instruct the jury on the castle doctrine.[1] This Court affirmed the judgment of sentence,

---

[1] Appellant had filed a timely notice of appeal, but this Court dismissed it for failure to file a brief. The trial court re-instated his direct appeal rights, and he timely filed the *nunc pro tunc* appeal.

concluding Nazario had waived his challenge to the jury instructions. We explained that he had done so by failing to object after the court instructed the jury but before the jury began to deliberate and, even if he had not waived the claim, it lacked merit. **Commonwealth v. Nazario**, 2020 WL 2120078, at \*6, \*6 n.6 (Pa.Super. filed May 4, 2020).[2] The Pennsylvania Supreme Court denied Nazario's petition for allowance of appeal.

Nazario filed a timely *pro se* PCRA petition, raising, among other things, trial court error for failing to instruct the jury as to the castle doctrine and counsel ineffectiveness for failing to effectively litigate and preserve the issue. The PCRA court appointed counsel, who filed a **Turner/Finley**[3] letter and petition to withdraw as counsel. The trial court granted the petition to withdraw and issued notice of its intent to dismiss the PCRA petition without

---

[2] We noted that the castle doctrine was "an evidentiary means by which a defendant may attempt to prove justification by self-defense." **Nazario**, 2020 WL 2120078, at \*6 (citation omitted). Under the castle doctrine a person "is presumed to have a reasonable belief that deadly force is immediately necessary" if "[t]he person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle" and "[t]he actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred." **Id.** (quoting 18 Pa.C.S.A. § 505(b)(2.1)). Further, the presumption is not available where "the actor is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity." **Id.** (quoting 18 Pa.C.S.A. § 505(b)(2.2)(iii)).

[3] **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988), and **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

a hearing. Nazario filed a response, and the court dismissed the petition in March 2022. Nazario filed a timely notice of appeal.[4, 5]

Nazario raises the following issues:

> I. Did the (PCRA) court abuse its discretion in denying the PCRA petition, where [Nazario] has established that:
>
>> A) The trial prosecutor introduced unsupported testimony to persuade the trial court from allowing [Nazario's] defense access to an affirmative-legal defense which ultimately deprived [Nazario] from his local and federal guarantee[d] right to submit an effective legal defense in accordance with: Pa. Const. Article one, Section nine; and U.S. Const. Amendment[s] six[] and fourteen?
>>
>> B) The trial court abuse[d] its discretion when considering unsupported Commonwealth's arguments which ultimately deprived [Nazario] from presenting, an affirmative-legal defense?
>>
>> C) The trial court abuse[d] its discretion when refusing to permit a "self-defense" theory and/or refusing to charge the jurors from Pennsylvania's law as written our General Assembly [at] 18 Pa.C.S.A. § 505, which embodies the facts in [Nazario's] case.

Nazario's Br. at 7.[6]

---

[4] The clerk's office filed and distributed the order on March 31, 2022. Thirty days would have been Saturday, May 1, 2022. Nazario filed his notice of appeal Monday, May 3, 2022. **See** 1 Pa.C.S.A. § 1908 (providing that the calculation of time periods omits weekends and holidays when the last day of the period is a weekend or holiday).

[5] The trial court did not issue an order directing Nazario to file a Rule 1925(b) statement, and Nazario did not file one.

[6] In the argument section of his brief Nazario also claims his PCRA counsel was ineffective because she did not speak with him prior to filing her
*(Footnote Continued Next Page)*

Nazario claims the court abused its discretion in dismissing the petition without a hearing. He maintains there was government interference and a miscarriage of justice. He argues he sought to argue the castle doctrine, but the Commonwealth opposed it and the Commonwealth relied on assertions that did not have supporting evidence.

We review the denial of PCRA relief to determine "whether the PCRA court's order is supported by the record and free of legal error." *Commonwealth v. Anderson*, 234 A.3d 735, 737 (Pa.Super. 2020) (quoting *Commonwealth v. Smith*, 181 A.3d 1168, 1174 (Pa.Super. 2018)).

To be eligible for PCRA relief, a petitioner must plead and prove his claims are not previously litigated or waived. 42 Pa.C.S.A. § 9543(a)(3); *Commonwealth v. Williams*, 196 A.3d 1021, 1027 (Pa. 2018). "An issue is previously litigated if 'the highest appellate court in which the petitioner could

_____

*Turner/Finley* letter. He claims, among other things, that, had PCRA counsel spoken with him, she would have known he was attempting to argue that he based his decision to testify on counsel's advice, and counsel advised him that the castle doctrine would apply to his case. Nazario's Br. at 13. He also argues his trial counsel was ineffective and that the PCRA court erred by relying on counsel's no-merit letter. However, Nazario did not include ineffectiveness claims implicating PCRA counsel or trial counsel or a claim of PCRA court error in the statement of questions involved section of his brief. He therefore waived the claims on appeal. *See* Pa.R.A.P. 2116(a) (providing that "No question will be considered unless it is stated in the [appellant's] statement of questions involved or is fairly suggested thereby.").

In addition, to the extent Nazario argues his direct appeal counsel was ineffective for failing to file a brief, he has waived this claim by failing to include it in his statement of questions presented. Moreover, that error was cured when he was permitted to appeal *nunc pro tunc*, and litigated such an appeal with new counsel.

have had review as a matter of right has ruled on the merits of the issue. . . .'" **Williams**, 196 A.3d at 1027 (citation omitted); 42 Pa.C.S.A. § 9544(a)(2). An issue is waived "'if the petitioner could have raised it but failed to do so before trial, at trial, . . . , on appeal, or in a prior state postconviction proceeding.'" **Williams**, 196 A.3d at 1027 (citation omitted); 42 Pa.C.S.A. § 9544(b).

Nazario's claims of "government interference" and "miscarriage of justice" are claims of trial court and prosecutorial error. That is, he claims that the Commonwealth improperly objected to his affirmative defense and made claims that were not supported by the evidence, and that the court erred in not allowing the castle defense. Nazario could have raised these claims on direct appeal, and in fact did raise a claim the court erred in failing to instruct on the castle doctrine. The claims are therefore previously litigated and/or waived and are not cognizable on PCRA review. *See Commonwealth v. Ford*, 809 A.2d 325, 329 (Pa.Super. 2002) (finding claims of prosecutorial misconduct at trial and trial court error waived because they could have been raised on direct appeal); *Williams*, 196 A.3d at 1031 (finding claims raised on direct appeal previously litigated).[7]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/22/2023

---

[7] The PCRA court found Nazario's claim of trial court error was barred from relief because it was previously litigated, and his claim of prosecutorial misconduct lacked merit. Trial Court Opinion, filed Feb. 23, 2022, at 7-8. We can affirm the trial court on any basis supported by the record. *See R.M. v. J.S.*, 20 A.3d 496, 506 n.8 (Pa.Super. 2011).

- 11 -